Filed 3/7/25  P. v. Morales CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OSCAR JOSE CARLOS MORALES, JR. et al.,<br><br>    Defendants and Appellants. | F086226<br><br>(Super. Ct. No. F20902403)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Oscar Jose Carlos Morales, Jr.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant Sabino Noel Palacios, Jr.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Oscar Jose Carlos Morales, Jr. (Morales), and Sabino Noel Palacios, Jr. (Palacios), stand convicted of special circumstance murder and other crimes related to their attempt to rob a drug dealer at his home. Morales killed the dealer with a single gunshot after the man refused to give up his contraband. Palacios was found liable based on a theory of felony murder.

Morales seeks reversal due to the admission of gang evidence at trial. We reject this claim. The challenged evidence revealed little more than Morales's membership in an unnamed gang. Even assuming the evidence should have been excluded, the alleged error was harmless.

Palacios argues there is insufficient evidence he was a major participant in the crimes and acted with reckless indifference to human life. We disagree. Relevant circumstances include the fact Palacios was personally armed with a gun and used it to pistol whip the victim immediately prior to the shooting. The jury found he personally inflicted great bodily injury upon the victim, which is a finding he does not dispute. Palacios acted ruthlessly during the attempted robbery, made no effort to minimize the violence and risk of death associated with the predicate felony, and displayed a total lack of regard for the victim after the shooting.

Both defendants challenge the trial court's imposition of parole revocation fines under Penal Code section 1202.45. (All undesignated statutory references are to the Penal Code.) Section 1202.45 is inapplicable to Palacios because he was not sentenced to any determinate prison terms, i.e., his sentence does not include a period of parole. We will strike the parole revocation fine from his judgment and affirm the judgment in all other respects.

Section 1202.45 does apply to Morales because his sentence includes determinate prison terms. However, the statute requires that the amount of the fine be the same as the amount of any restitution fine imposed under section 1202.4, subdivision (b). The restitution fine imposed upon Morales was $5,000, but the parole revocation fine was in

2.

the amount of $10,000.  We will modify the judgment against Morales by reducing the parole revocation fine to $5,000.  As so modified, the judgment will be affirmed.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Crime Scene Investigation*

On January 25, 2020, victim Albert Lopez was shot to death at his home in the City of Lindsay.  A friend of the victim, J.B., witnessed the shooting and immediately called 911.  Police arrived within minutes and began collecting evidence.

The victim was found in his driveway, near an open garage attached to the residence.  The first police officer on the scene noticed a "pretty significant amount of blood around [the victim's] head and facial area."  An autopsy later showed the victim was shot with a .45-caliber bullet, which entered his left abdomen and "crossed an artery," causing him to bleed to death.  The autopsy showed additional trauma consisting of multiple facial wounds.

In the driveway, investigators found a .45-caliber handgun magazine designed for use with a Taurus model PT 24/7 Pro semiautomatic pistol.  The Taurus logo was visible on the magazine.  The magazine contained seven live rounds, and an additional unfired .45-caliber cartridge was located on the ground.  The loose ammunition contained traces of human DNA, which was ultimately matched to defendant Morales.

Inside the victim's home, police found approximately 10.7 pounds of marijuana and 1.5 pounds of methamphetamine, plus scales and packaging materials.  Police also found a digital video recorder, which was part of a home security system.  The home security equipment led to the discovery that part of the incident was captured on video.

The video showed the victim and a female companion (witness J.B.) arriving at the residence shortly before 2:30 a.m.  A few minutes later, the victim opened his garage door to welcome a second female visitor, later identified as Marissa De La Cerda.  De La Cerda was accompanied by a man, later identified as Palacios, who appeared at the garage approximately five seconds after she did.

3.

Following the arrival of Palacios and De La Cerda, the victim began to manually close the garage door. Suddenly another man, later identified as Morales, came running up the driveway and blocked the garage door from closing. Morales and Palacios then began attacking the victim, and De La Cerda walked back down the driveway. The fighting lasted approximately 50 seconds and ended with Morales and Palacios leaving the residence and moving out of the camera's view.

*Further Investigation and Charges*

Morales and De La Cerda were quickly identified as suspects. De La Cerda had recently exchanged several messages with the victim, by phone and Facebook Messenger, regarding the sale of methamphetamine. Morales had recently been paroled from prison and wore a "GPS ankle monitor," which showed he was at the victim's residence at the time of the murder.

Law enforcement agents were already wiretapping Morales's phone, and he was recorded having several incriminating conversations with a third party one week after the shooting. In those conversations, Morales covertly expressed his desire to alter, and obtain a new magazine for, a Taurus model 24/7 Pro handgun.

The record does not explain how Palacios was first identified as a suspect. However, California Highway Patrol records showed he, Morales, and De La Cerda were together in the same car during a routine traffic stop approximately 90 minutes prior to the murder. Palacios's cell phone location data also placed him with Morales throughout the night. De La Cerda confirmed Palacios's involvement during a recorded interview with police in April 2020.

On March 25, 2021, during a pre-preliminary hearing attended by all three suspects, Morales threatened De La Cerda with death if she "said anything" about the subject events. De La Cerda reported the incident to her lawyer the same day.

A preliminary hearing was conducted on August 25, 2022. On that date, De La Cerda agreed to testify against Morales and Palacios in exchange for a lower term

4.

sentence on an admitted charge of conspiracy to commit robbery. The terms of De La Cerda's plea agreement also provided for benefits under the California Witness Protection Program.

Morales was charged with murder (§ 187, subd. (a); count 1). The crime was alleged as "felony murder" in the criminal information (capitalization omitted), both generally and for purposes of section 190.2, subdivision (a)(17)(A). The murder was specifically alleged to have occurred during the commission of a robbery. Count 1 also included a firearm enhancement allegation under section 12022.53, subdivision (d). [1]

Morales was also charged with "conspiracy to commit home invasion robbery" (capitalization omitted) (see §§ 182, subd. (a)(1), 211, 213, subd. (a)(1)(A); count 3) and dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 5). Count 3 included a firearm enhancement allegation under section 12022.5, subdivision (a). Morales was further alleged to have suffered a prior serious felony conviction (§ 667, subd. (a)) that also qualified as a strike for purposes of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12).

Palacios was charged with murder (count 2) and conspiracy (count 4) in the exact same manner as Morales, including the special circumstance allegation of murder committed during a robbery. Count 2 included a firearm enhancement allegation under section 12022.53, subdivision (b). Count 4 included a firearm enhancement allegation under section 12022.5, subdivision (a), and a separate enhancement for personal infliction of great bodily injury (GBI) upon the victim (§ 12022.7, subd. (a)). Palacios was further

---

[1]The evidence was arguably more supportive of an attempted robbery, which was presented as an alternate theory at trial. Although Morales and Palacios attempted to rob the victim of drugs, there was no evidence of them succeeding in that effort. The People's theory of robbery was that Morales gave De La Cerda approximately $400 to hand over to the victim as a ruse, and Morales and/or Palacios later took some of the money back from the victim in the course of beating and shooting him.

alleged to have suffered five prior strike convictions and five prior serious felony convictions (three of which were adjudicated in a single proceeding).

Morales and Palacios were jointly tried before a single jury in early 2023.

*Trial Evidence*

De La Cerda testified as a prosecution witness. According to the testimony, she lived in Sanger during the relevant time period and supported herself by selling methamphetamine. She was also a habitual user of the drug. De La Cerda was a low-level dealer, trafficking in quantities no larger than a few ounces at a time. She testified to having had a "sexual relationship" with defendant Morales, which involved seeing him approximately once a week.

De La Cerda responded affirmatively when asked if she had known Morales "from the drug business in Sanger." She answered "yes" when asked if she had known Morales was "in a gang." She also answered "yes" when the prosecutor asked, "And did he know that you knew that he was in a gang?" This testimony was held relevant and admissible to prove the charge of dissuading a witness. The jury was not told she first became acquainted with Morales in his capacity as a representative of the Sureño criminal street gang and was required to pay him "taxes" in order to sell narcotics in Sanger.

The victim, Albert Lopez, was a drug dealer in Tulare County. De La Cerda first met him a few weeks prior to his death. After being introduced to De La Cerda through mutual friends, Lopez offered to become one of her suppliers. De Le Cerda liked the quality of his methamphetamine and bought from him at least once during the time she knew him.

On or about January 21, 2020, De La Cerda and Morales discussed buying drugs from the victim. Over the next several days, De La Cerda exchanged messages with the victim about purchasing a half pound of methamphetamine. By January 24, 2020, Morales had informed De La Cerda that his intention was not to purchase drugs from the victim, but to instead rob the victim of drugs.

6.

On the night of January 24, 2020, Morales met up with De La Cerda in Sanger. He was driving a sport utility vehicle (SUV). When De La Cerda entered the SUV, defendant Palacios was already sitting in the back seat. De La Cerda had never met Palacios, and Morales briefly introduced him as his "good homie."

Morales intended to drive the group to a casino in Lemoore, where the victim had told De La Cerda he would meet her. The plan was for Morales and Palacios to rob the victim in a parking lot. While the group was on their way to Lemoore, the victim informed De La Cerda by phone that he only had an ounce of methamphetamine on him. He also claimed to have lost several hundred dollars gambling and said he "needed gas money to get back to Lindsay." De La Cerda relayed this information to Morales and Palacios, and Morales continued to drive toward Lemoore.

Morales got lost on his way to the casino and ended up in Kettleman City shortly after midnight. While backtracking to Lemoore, he was pulled over by the California Highway Patrol (CHP) for a Vehicle Code infraction. The detaining officer testified the stop was made on January 25, 2020, at 12:36 a.m. The stop lasted approximately 20 minutes, and the group resumed travel just before 1:00 a.m.

Morales drove himself, Palacios, and De La Cerda to a gas station located at or near the casino in Lemoore. Upon their arrival, De La Cerda got out of the SUV and purchased $20 worth of gas for the victim. Next, De La Cerda's group began driving toward Lindsay to meet up with the victim again at his home.

On the way from Lemoore to Lindsay, Morales stopped in a "rural area" and removed the license plates from the SUV. The victim, meanwhile, stopped in Visalia to pick up a friend, J.B., before continuing on to his home. The victim and J.B. arrived in Lindsay a few minutes before Morales, Palacios, and De La Cerda.

While driving to Lindsay, the occupants of the SUV finalized their plan to rob the victim. It was agreed that Palacios and De La Cerda would approach the victim together, with Palacios pretending to be De La Cerda's cousin. De La Cerda would hand the

7.

victim some money, ostensibly tendering payment for the drugs, and Morales would "come in after" to assist Palacios with the robbery.

The detail about Palacios posing as De La Cerda's cousin was independently corroborated by eyewitness J.B. She testified to overhearing conversations the victim had with De La Cerda "on speaker phone" shortly before he died. De La Cerda called "a couple of times asking for directions and verifying the address and making sure she was going to the right place," and the victim explained to J.B. that the caller was going to be "purchasing a half a pound of meth." When De Le Cerda called again to say she was "about five minutes out," the victim told her, "[H]ave your money ready and come in alone." De La Cerda then said "something along the lines of [']I don't feel comfortable. I'd rather bring my cousin in with me.[']" The victim replied, "[T]hat's not your cousin. You don't need to lie."

The jury was shown the home security video of De La Cerda and Palacios approaching the victim's garage, and Morales running up behind them approximately 10 seconds later. De La Cerda testified to having handed the victim cash moments before he was attacked by Morales and Palacios. She "got scared and walked out" of the garage during the altercation. De La Cerda denied seeing any guns during the incident, but she admitted hearing a gunshot after walking back to Morales's SUV.

Eyewitness J.B., who was standing in the garage when the victim was attacked, testified both of the male perpetrators were armed with handguns. She identified Morales in court as one of the attackers. The men had asked the victim, "Where's the jale," which J.B. knew was a slang term for "drugs."[2]

J.B. testified to seeing both male perpetrators "pistol whipping" the victim, beating him so severely that she could "hear his bones in his face breaking." The men "were

---

[2]The word "jale" is correctly spelled in the Clerk's Transcript and in a statement of facts accompanying Morales's motions in limine. In the Reporter's Transcript, the word is phonetically spelled as "holly" and "hollay."

demanding the dope," but the victim "wasn't giving nothing up." Somebody shot the victim (J.B. did not see who) before both assailants "ran out of the garage." J.B. next heard a car door slam and the sound of a vehicle "peel[ing] off."

De La Cerda testified that Morales drove her and Palacios back to Sanger after the shooting. Morales and Palacios conversed in Spanish, and she did not know what they were saying. Palacios at one point said, apparently in English, that he "wasn't sure about" De La Cerda. Palacios "seemed angry." He took De La Cerda's phone from her and "smashed it because it had evidence on it."

On the drive home, Morales "stopped in the country" to reattach the license plates to the SUV. As they got closer to Sanger, Morales made statements about having misplaced his "clip," which De La Cerda understood to mean the "thing that holds the bullets." According to De La Cerda's testimony, Morales wondered aloud whether he dropped the clip at the crime scene "or in the country when he was putting the license plates back on."

The parties stipulated to informing the jury that police had "electronically intercepted" several telephone calls between Morales and an uncharged individual named Carlos. Those calls were made between January 31, 2020, and February 7, 2020, approximately one to two weeks after the victim was killed. Recordings of the calls were played for the jury, and a CHP detective gave expert testimony about their contents.

The People's expert was permitted to summarize his professional background as a gang investigator, which included current assignments on two multiagency gang task forces. The expert was also permitted to testify that he had determined Morales and Carlos "were members of the same gang." This testimony was held relevant and admissible in relation to the expert's interpretation of "coded language" used by Morales and Carlos on the recordings.[3]

---

[3]The expert testified, "I'm unable to interpret calls such as this between members of the same gang without the gang context and my past experience of seeing how each gang has similar

9.

During one of the intercepted calls, Morales talked about "changing the transmission on the car" but not having any tools. Carlos asked if Morales had "the appliance" and if they were going to "switch back off." Morales replied that something had happened, but he would explain it "in person." When Carlos replied that it sounded like "bad news," Morales cryptically said some people "went swimming" and "almost drowned, or they did drown."

In a subsequent phone call, Carlos said, "[I]f it's no good, what do you want to do with it?" Morales answered, "Um, I don't want to throw it away, 'cause I'm gon—I need one 'til I get one." Carlos replied, "Wait, but you can't have it in your possession …." Carlos later asked, "You got it right now?" When Morales responded affirmatively, Carlos said, "Ok, I'm gonna go pick it up. Where you at?" The conversation ended with the men arranging to meet at a particular restaurant. Through live visual surveillance and other methods, law enforcement agents confirmed that Morales and Carlos met up at a restaurant on February 1, 2020, and sat together in a car for several minutes.

In calls intercepted after the in-person meeting, Carlos told Morales, "[T]hat thing is good to go …. I just fixed it all up." Carlos further stated that all Morales needed to do was "get, uh, uh, what you lost." Carlos also said he had texted Morales "the model," and Morales could buy what he needed at a "gun store." A text message sent from Carlos to Morales approximately five seconds prior to the call had read, "Taurus 24/7 Pro." The men spoke again the next day, and Carlos said, "You have the text right?" Morales replied, "Yeah, yeah, yeah, yeah." Carlos then said, "Twenty-four seven … Pro." Morales responded, "Yeah, I got it." Carlos further advised, in reference to shopping at a gun store, "All you gotta do is say, '[H]ey, I need an extra mag.'"

---

kind of methods of using coded language. A few of the terms are the same, but as you—as I've done this over and over, you see that there are nuances and specific language to each gang, so knowing that they're part of the same gang let's [*sic*] me know they're going to mutually understand when they use that gang's internal language."

10.

The expert believed Carlos had essentially performed the services of a gunsmith. In the expert's opinion, there were "two specific guns" discussed throughout the conversations, and the statements about switching off were in reference to the exchange of those guns. The expert interpreted the comments about swimming and drowning as pertaining to the shooting of the victim a few days earlier. The services Carlos talked about providing, with the end result being described as "like a brand new car," were interpreted to mean replacing certain parts of a gun to make it untraceable, e.g., "the extractor, the firing pin or the barrel." Carlos had twice said, "It's like a fresh start."

Morales and Carlos agreed to meet up again on February 7, 2020, to "switch it off," which the expert interpreted to mean Carlos planned to give the refurbished firearm back to Morales. The exchange never took place, however, because police arrested Morales on the day of the planned meeting. A search warrant was later executed at Carlos's residence, where police recovered a Taurus model 24/7 Pro handgun.

The handgun magazine found at the crime scene fit the Taurus pistol seized from Carlos's home. However, ballistics testing of the gun in comparison to the bullet that killed the victim was inconclusive. The parties stipulated that "Department of Justice criminalists [could] neither confirm that it was fired from the Taurus handgun or confirm that it [was not fired] from the Taurus handgun." The People's firearms expert testified the gun found in Carlos's home had a replaceable barrel, and if the gun was the murder weapon but the barrel had been replaced it would not be possible to match the firearm to the bullet that killed the victim. The parties also stipulated to the fact Morales's DNA was found on an unfired cartridge/bullet recovered at the crime scene.

Defense counsel for Palacios rested without presenting any evidence. Morales's attorney elicited testimony from two defense experts. The first expert testified about the location data obtained from Morales's GPS ankle monitor. The expert opined that while the data showed Morales was at the victim's residence during an approximate five-minute period, it showed little or no movement at that location. More specifically, the expert

11.

interpreted the GPS data as showing the ankle monitor was stationary for approximately two to four minutes.

The testimony of Morales's GPS data expert was intended to support a theory that Morales had stayed in the SUV and an unidentified fourth perpetrator went into the garage with Palacios. This theory was further based upon the visibility of a brake light on the security video after De La Cerda had walked back to the SUV, and De La Cerda's inability to recall whether she started the vehicle while waiting for Morales and Palacios to finish the robbery. In rebuttal testimony, the People's GPS expert explained that "relatively small movements" of less than 100 feet are not always reflected in GPS tracking data from ankle monitors. The People's expert went on to testify about personally conducting a "real world" experiment with "a GPS tracker [set] to the same settings" in which movements of approximately 45 to 92 feet within a period of less than one minute went undetected.[4]

The second defense witness described himself as "a non-law enforcement gang expert." He agreed the phone conversations between Morales and Carlos included discussions about a gun. However, he opined that many of the "coded words" were open to interpretations different than those ascribed to them by the People's expert.

---

[4]The parties do not discuss Morales's fourth perpetrator theory in their briefs. It is noted here to provide a more complete summary of the defenses presented at trial. In the prosecutor's rebuttal argument, he derisively referred to this theory as "the hitchhiker defense," since a fourth perpetrator would had to have joined the group after they left the casino but before they arrived at the victim's home in Lindsay. The prosecutor argued the theory was speculative and had no evidentiary support. The prosecutor also argued the testimony of Morales's GPS data expert was consistent with the People's theory of him being the shooter. The video evidence showed the perpetrators were at the crime scene for less than five minutes, from the time of arrival to time of departure. The man identified as Morales came running up the driveway when the video counter read 02:31:54 and went back down the driveway and toward the SUV when the counter read 02:32:44. The defense expert could only estimate that Morales's ankle monitor was stationary for "between two and four minutes," which aligned with the People's theory that Morales spent "three minutes sitting inside the car outside on the driveway."

*Verdicts and Sentencing*

While the jury deliberated, Morales and Palacios contingently admitted the truth of all prior strike and serious felony conviction allegations. Both defendants were subsequently convicted as charged. True findings were made on the special circumstance allegations and all enhancement allegations.

As to count 1, Morales was sentenced to life in prison without the possibility of parole (LWOP) plus 25 years to life for the gun enhancement under section 12022.53, subdivision (d), and five years for his prior serious felony conviction. As to count 3, Morales was sentenced to the middle term of six years (§§ 182, 213, subd. (a)(1)(A)), doubled to 12 years for the prior strike, plus four years for the gun enhancement under section 12022.5, subdivision (a). Punishment for count 3 was stayed pursuant to section 654. A concurrent determinate prison term was imposed for count 5. Relevant to the current claim of sentencing error, the trial court imposed a $5,000 fine pursuant to section 1202.4 and a $10,000 fine pursuant to section 1202.45, the latter of which was suspended.

As to count 2, Palacios was sentenced to LWOP plus 10 years for the gun enhancement under section 12022.53, subdivision (b), and 15 years for the prior serious felony convictions. Because of his prior strikes, Palacios was sentenced on count 4 to an indeterminate life term. The indeterminate term and punishment for all related enhancements was ordered stayed pursuant to section 654. Relevant to the current claim of sentencing error, the trial court imposed and suspended a $10,000 fine pursuant to section 1202.45.

## DISCUSSION

I. **Admission of Gang Evidence**

A. **Legal Overview**

"'"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code

13.

section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects.'" [Citation.] Evidence is relevant when it ""'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive."'" [Citation.]" (*People v. Parker* (2022) 13 Cal.5th 1, 53.)

In cases where there are no gang charges, "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) On the other hand, evidence of gang membership may tend to prove "identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid*.) "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) "Such evidence is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1095.)

As with other evidentiary rulings, a trial court's decision to admit gang evidence is reviewed for abuse of discretion. (*People v. Ramirez*, *supra*, 13 Cal.5th at p. 1095.) "Reasonableness in view of all the circumstances is well established as the test of whether discretion has been abused." (*Brochtrup v. Intep* (1987) 190 Cal.App.3d 323, 329; see *People v. Fuiava* (2012) 53 Cal.4th 622, 663.) Because evidence of gang membership "'creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged,'" trial courts must "carefully scrutinize" such evidence before admitting it. (*People v. Melendez* (2016) 2 Cal.5th 1, 28–29.) The less probative the gang evidence is, the less reasonable it will be to admit it despite the risk of prejudice.

The improper admission of gang evidence is typically reviewed "under the *Watson* harmless error standard (*People v. Watson* (1956) 46 Cal.2d 818), pursuant to which we

14.

reverse only if, viewing the record in its entirety, we are of the opinion that it is more likely than not the defendant would have achieved a better result in the absence of the error." (*People v. Hall* (2024) 104 Cal.App.5th 1077, 1094–1095; see *People v. Tran* (2022) 13 Cal.5th 1169, 1208–1209.) The standard for federal constitutional error, as described in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), does not apply unless the error resulted in a due process violation and a "'*fundamentally unfair*'" trial. (*Tran*, at p. 1209.) The *Chapman* standard is rarely applicable to erroneous determinations of relevance or admissibility under Evidence Code section 352. (See *People v. Ramirez*, *supra*, 13 Cal.5th at p. 1097; *People v. Esayian* (2003) 112 Cal.App.4th 1031, 1042 ["A person seeking to overturn a conviction on due process grounds bears a heavy burden …. Ordinarily, even erroneous admission of evidence does not offend due process"].)

### B.   Morales's Claim

As discussed, De La Cerda was permitted to testify she knew Morales was a gang member to support the charge of witness dissuasion under section 136.1, subdivision (c)(1). The trial court gave this explanation: "[T]he evidence goes to [defendant's] intent and ability to carry out the threat. The alleged threat cannot be viewed in a vacuum. There needs to be context of the purported threat, words placed in context. [Defendant] knows that Miss De La Cerda knows he's a gang member and [it] provides evidence that [defendant] intended the statements to be a threat." The threat, as described in De La Cerda's testimony, was as follows: "[Morales] told me that they didn't have anything on us, not to say anything, and if I said anything, I would be dead." The threat was made while they were together in custody at a court hearing.

Dissuading a witness is a specific intent crime. (*People v. Young* (2005) 34 Cal.4th 1149, 1210.) It is necessary to prove "the defendant's acts or statements are intended to affect or influence a potential witness's or victim's testimony." (*People v.*

15.

*McDaniel* (1994) 22 Cal.App.4th 278, 284.) Section 136.1, subdivision (c)(1) requires the act of dissuasion to be "accompanied by force or by an express or implied threat of force or violence." However, unlike the crime of making criminal threats (§ 422), the effect of the defendant's statements on the witness or victim is *not* an element of the offense. (See *People v. Toledo* (2001) 26 Cal.4th 221, 228 [§ 422 requires "that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety'"].) The trial court acknowledged this distinction but still found defendant's gang membership to be more probative than prejudicial. The court also discussed proving Morales's "ability to carry out the threat," which defense counsel correctly argued is likewise not an element of section 136.1.

"The circumstances in which the defendant's statement is made, not just the statement itself, must be considered to determine whether the statement constitutes an attempt to dissuade a witness from testifying." (*People v. Wahidi* (2013) 222 Cal.App.4th 802, 806.) However, the burden of proof is relatively low. "If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been committed." (*Ibid*.) There is also a malice requirement, which in this context is defined as "an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (§ 136, subd. (1).) Because the elements of section 136.1 were easily inferable from De La Cerda's testimony without the additional gang information, the question of error is a close issue.

The question of error is also close with regard to the challenged testimony of the CHP gang investigator. The defense argued it would be equally effective, and less prejudicial, for the People's expert to say his ability to interpret the coded language in the recorded phone calls was based on his familiarity with "criminal talk" through prior training and experience. Morales's attorney further argued, "What's important is … what

16.

my client [was] allegedly trying to do, … [and] it doesn't have to be through [a] gang. It doesn't have to be because [he's a] gang member [who is] trying to clean up the murder weapon." The trial court ruled the expert's opinion that Morales and Carlos were members of the same gang was admissible to give "context" to the coded language.[5]

Morales devotes most of his briefing to the question of error. His arguments regarding prejudice are less developed and unpersuasive. The question of prejudice is not a close issue. For the following reasons, we conclude the alleged errors were harmless.

As a preliminary matter, we reject Morales's argument for review under the *Chapman* standard. In reliance upon *People v. Albarran* (2007) 149 Cal.App.4th 214, he contends the evidence of his gang membership made the trial fundamentally unfair. As described by the author of its majority opinion, *Albarran* represents "one of those rare and unusual occasions where the admission of evidence … violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id*. at p. 232.) The case is easily distinguishable.

In *Albarran*, evidence of gang membership was admitted in support of gang enhancement allegations, but the prosecutor engaged in "overkill" by presenting police testimony about the appellant's gang that "consumed the better part of an entire trial day." (*People v. Albarran*, *supra*, 149 Cal.App.4th at pp. 227, 228 & fn. 10.) The testimony focused on the identities of other gang members, descriptions of unrelated criminal activity by other gang members, evidence of the gang's threats to kill police officers, and references to the "Mexican Mafia"—all of which was "irrelevant to the underlying charges" and had "no legitimate purpose in [the] trial." (*Id*. at pp. 227–231.) The evidence created "a real danger that the jury would improperly infer that whether or

_____

[5]In the trial court's in limine ruling, it further reasoned that mutual gang membership was relevant and "very probative" in terms of showing the level of trust that existed between Morales and Carlos. During the trial, however, the court ruled the prosecutor's questions about "trust" were irrelevant. Morales's objection to the gang expert's testimony about the significance of trust between gang members was sustained, and the testimony was ordered stricken.

17.

not [the appellant] was involved in [the charged offenses], he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished. Furthermore, [the] gang evidence was extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues." (*Id*. at p. 230, fn. omitted.)

Here, in contrast, the trial court expressly ruled, "[T]here is to be no reference in this trial as to wiretaps, the term wiretaps, the Surenos street gang …. There is to be no testimony about a federal investigation … or gang specific crimes. There is to be no testimony of other gang members['] bad acts. No predicate crimes. [The People's expert] can testify about his training and his background in a general sense involving gang investigations."

The evidence of Morales's gang membership was essentially limited to that one basic fact. The jury was never told the name of his gang or his status within the gang, nor did it receive any information about the gang's criminal activities. Morales's assertion that the gang evidence was a "focal point" of the People's case-in-chief is simply unfounded. It was a tiny component of the People's case. The prosecutor did not even mention Morales's gang membership in closing or rebuttal argument.

Assuming the evidence was inadmissible, the error is reviewed for prejudice under *People v. Watson*, *supra*, 46 Cal.2d 818. "'In making that evaluation, [we] may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

The absence of evidence regarding the criminal activities of Morales's gang mitigated the risk of jurors *improperly* inferring he had a criminal disposition. But there was plenty of admissible evidence from which inferences of his criminality and guilt

could have been drawn. He was actively involved in "the drug business in Sanger" and the principal organizer of a conspiracy to rob a methamphetamine dealer. He was identified by an independent eyewitness as being armed during the attempted robbery and participating in the savage "pistol whipping" of the victim. And, moreover, the evidence pointed to him being the actual killer. Gang membership was but one of many indicators of bad character.[6]

Morales's only argument for the possibility of a different result on count 1 is that eyewitness J.B. "could not positively identify [him] as the shooter." This argument technically speaks to the true finding on the gun enhancement under section 12022.53, subdivision (d). Even if the jury was uncertain about who shot the victim, there was overwhelming evidence of Morales's felony-murder liability as a major participant who acted with reckless indifference to human life. (§§ 189, subd. (e)(3), 190.2, subd. (d).) We need not discuss accomplice liability because there is no likelihood the jury's conclusion about Morales being the killer was affected by the gang evidence.

The victim was killed by a .45-caliber bullet. Morales's DNA was found on an unfired .45-caliber cartridge recovered at the crime scene. The bullet that killed the victim had the same design characteristics as the unfired ammunition containing Morales's DNA and other ammunition found in the handgun magazine located near the victim's body. The People's firearms expert test-fired the same type of .45-caliber ammunition using the Taurus handgun seized from Carlos's home, and the test-fired bullets showed some (but not all) of the same characteristics found on the bullet that killed the victim. The expert could not conclusively determine whether the bullet that killed the victim was fired from the gun recovered from Carlos's residence.

---

[6]Assuming the jury was paying attention during certain testimony, it also knew Morales was married with children and had been cheating on his wife with De La Cerda.

There was strong evidence the Taurus ammunition clip found at the crime scene fell out of the handgun used by Morales during the attempted robbery. The evidence was also compelling of the conclusion that Morales gave that firearm to Carlos after the shooting, and Carlos altered the gun in a way that caused the ballistics testing to be inconclusive. It is not reasonably probable the jury would have doubted Morales was the shooter but for the revelation of his membership in an unnamed gang.

Morales does not allege the possibility of a different result on count 3 (conspiracy to commit robbery). His remaining argument concerns count 5 (dissuading a witness). Morales contends that without the gang evidence, the jury was more likely to conclude De La Cerda lied about the death threat "to curry favor with the prosecution." A similar argument regarding De La Cerda's motive to lie was refuted during the prosecutor's rebuttal argument at trial.

The death threat was made on March 25, 2021. The evidence of De La Cerda reporting the incident the same day was unrefuted. She did not enter into her plea agreement until 17 months later, on August 25, 2022. Also, witness intimidation was the most inconsequential of the five counts charged in the case. If De La Cerda wanted to embellish her story to "curry favor" with the prosecution, she could have easily claimed to have seen Morales and/or Palacios in possession of a firearm. Yet in her trial testimony, she repeatedly denied seeing any guns before, during, or after the shooting. It is not reasonably probable the jury would have disbelieved her witness intimidation testimony but for the disclosure of Morales's gang membership.

Furthermore, "'[a] limiting instruction can ameliorate [Evidence Code] section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose.'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 409.) The trial court gave a limiting instruction stating, in pertinent part, "You may not conclude from [the evidence of gang membership] that the defendant is a person of bad character or that he

20.

has a disposition to commit crime." We presume the jury followed this instruction. (See *People v. Waidla* (2000) 22 Cal.4th 690, 725.)

The additional cases Morales relies upon do not change the above analysis. He draws a fair comparison to *People v. Cardenas* (1982) 31 Cal.3d 897 insofar as the improperly admitted gang evidence in *Cardenas* was also limited to the fact of the appellant's membership in a gang. (*Id*. at p. 903.) The similarities between this case and *Cardenas* end there.

The erroneously admitted gang evidence in *Cardenas* created "a real danger that the jury would improperly infer that appellant had a criminal disposition." (*People v. Cardenas*, *supra*, 31 Cal.3d at p. 905.) But that was only part of the problem. The lower court also erred by admitting evidence the appellant was a heroin addict. Quoting from an appellate court decision published in 1965, Chief Justice Bird wrote that "[t]he impact of narcotics addiction evidence 'upon a jury of laymen [is] catastrophic'" because the general public "'has been taught to loathe those who have anything to do with illegal narcotics in any form or to any extent.'" (*Id*. at p. 907.) If the quoted language still holds true today, then Morales's fate was already sealed by the "catastrophic" impact of the *admissible* evidence of his involvement in the use and sale of methamphetamine.

The combination of errors in *Cardenas* was held prejudicial in light of "an extremely close question as to whether appellant was the man responsible for the crimes charged." (*People v. Cardenas*, *supra*, 31 Cal.3d at p. 914.) The appellant's presence during the incident was disputed, and the evidence was "sharply conflicting." (*Id*. at p. 901.) Here, the evidence of Morales's guilt was strong and largely indisputable.

Morales also relies on *People v. Avitia* (2005) 127 Cal.App.4th 185. There, the appellant (Avitia) was arrested after a neighbor reported seeing him firing a handgun. (*Id*. at pp. 187–188.) Police found him in possession of a "pellet pistol" and several actual firearms. (*Id*. at p. 188.) At trial, "Avitia testified in his own defense" to refute

allegations of discharging a firearm in a grossly negligent manner.  He claimed to have been shooting the pellet pistol.  (*Id*. at pp. 190–191.)

There were no gang charges in *Avitia*, but "the trial court admitted, over Avitia's objection, evidence that gang graffiti was found in Avitia's bedroom."  (*People v. Avitia*, *supra*, 127 Cal.App.4th at p. 187.)  On appeal, the gang evidence was held to be "completely irrelevant to any issue at trial" and its admission an abuse of the trial court's discretion.  (*Id*. at p. 193.)  Although "the gang evidence was quite limited," the error was prejudicial because it "seriously undercut" Avitia's credibility as a witness, and the prosecution's case was "not overwhelming."  (*Id*. at pp. 194–195.)

The *Avitia* court observed that "gangs are generally held in low regard among law-abiding citizens.  It is common knowledge that gang members commit crimes, often with firearms … [and] evidence a defendant is a gang member may be highly inflammatory." (*People v. Avitia*, *supra*, 127 Cal.App.4th at p. 194.)  We do not disagree with those observations, but the prejudice in *Avitia* was directly tied to the fact "Avitia's credibility was key to the success of his defense."  (*Id*. at p. 195.)  Morales did not submit to custodial interrogation or testify at trial, so his credibility was never at issue.  (See, e.g., *People v. Case* (2018) 5 Cal.5th 1, 23 [noting "defendant's credibility was not at issue as he did not testify"].)  What further distinguishes this case from *Avitia* is the overwhelming evidence Morales committed a violent crime with a firearm.  The jury would have drawn the same inferences regarding his criminal disposition with or without the evidence of his gang membership.

## C.    Palacios's Claim

In his opening brief, Palacios makes a cursory claim of prejudice stemming from the evidence of Morales's gang membership.  Palacios complains about the prosecutor twice referring to him as Morales's "good homie" during closing argument, which he alleges was done to "insinuate" he and Morales were "fellow gang members."  The

argument continues: "Though no gang evidence was admitted against [Palacios], the prejudicial stigma of being a 'good homie' of a purportedly high level gang member seriously infected the case against [him]."

We note two misstatements in Palacios's arguments. He incorrectly contends the prosecutor's use of the term "good homie" was a paraphrasing of De La Cerda's custodial statements to police. In fact, the prosecutor quoted from the evidence admitted at trial. The jury heard an audio recording of De La Cerda telling detectives, "[Morales] just said it's his good homie." Palacios also seems to imply the jury was exposed to evidence Morales was a "high level gang member," but the assertion is made without a record citation. The trial court prohibited any evidence of Morales's status within his gang, and we are unaware of such evidence being presented at trial.

The argument about the word "homie" appears to be based on evidence outside the record. Lawyers who work on gang cases may know this term is sometimes used by gang members to mean "fellow gang member," but Palacios cites no evidence or authority from which to conclude laypersons are familiar with such usage, or that any jurors in this case possessed such knowledge. His claim is also forfeited by the failure to object below. (*People v. Adams* (2014) 60 Cal.4th 541, 568.)

In opening statements, Palacios's trial counsel told the jury, "[Y]ou'll hear no evidence that my client was in a gang." Palacios concedes his attorney's statement proved to be accurate, i.e., "no gang evidence was admitted against him." We therefore reject his claim.

## II.    Felony-Murder Liability (Palacios)

Palacios was found liable for felony murder as an accomplice pursuant to sections 189 and 190.2. He disputes the sufficiency of the evidence supporting those verdicts. We conclude the evidence was sufficient.

23.

## A.    Standard of Review

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)  These principles apply regardless of the extent to which a judgment rests on circumstantial rather than direct evidence.  (*Ibid*.)  "The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings." (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

The standard of review is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.)  "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)  "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]  '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]"'" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054; see *People v. Zamudio* (2008) 43 Cal.4th 327, 357 ["A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict"].)

## B.    Law and Analysis

Section 190.2 contains a list of "special circumstances" under which the only sentencing options for a defendant convicted of first degree murder are death or LWOP.  The statute applies to a murder "committed while the defendant was engaged in, or was

an accomplice in," the commission or attempted commission of a robbery. (§ 190.2, subd. (a)(17)(A).) "It is sufficient if the defendant is the actual killer or either intends to kill or 'with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission' of the felony." (*People v. Rountree* (2013) 56 Cal.4th 823, 854, quoting § 190.2, subd. (d).) In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court explained and clarified the requirements for finding major participation and reckless indifference to human life within the meaning of section 190.2.

Special circumstance liability requires a conviction of first degree murder. (§ 190.2, subd. (a).) "Under the *felony-murder* doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant [may be] liable for either first or second degree murder, depending [in part] on the felony committed." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654; see *People v. Arellano* (2024) 16 Cal.5th 457, 476 ["The felonies that can support a felony murder … are limited to those that are inherently dangerous"].) If the felony is listed in section 189 and all other requirements are met, it is murder in the first degree. (*Gonzalez*, at p. 654.) Robbery and attempted robbery are qualifying felonies under section 189, subdivision (a).

When death occurs during the commission of a robbery or attempted robbery, first degree murder liability extends to any "major participant" in the offense who acted with "reckless indifference to human life." (§ 189, subd. (e)(3).) The elements of major participation and reckless indifference to human life were incorporated into the felony-murder doctrine by legislative decree in 2019, approximately one year before the crimes in this case were committed. (See Stats. 2018, ch. 1015, § 3.) In doing so, the Legislature codified the California Supreme Court's interpretations of those concepts as stated in *Banks* and *Clark*. (*People v. Strong* (2022) 13 Cal.5th 698, 710.) In other

words, the requirements for felony-murder liability under section 189, subdivision (e)(3), are the same as the requirements for special circumstance liability under section 190.2, subdivision (d). (*In re Taylor* (2019) 34 Cal.App.5th 543, 561.)

The major participant and reckless indifference elements are related and "'often overlap.'" (*Clark*, *supra*, 63 Cal.4th at p. 615, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 153, fn. 12.) The *Bank*s and *Clark* opinions list factors relevant to determining whether the respective elements can be found in a given case. No one factor "'is necessary, nor is any one of them necessarily sufficient.'" (*Clark*, at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.) Both elements are ultimately determined by the totality of the circumstances. (*In re Scoggins* (2020) 9 Cal.5th 667, 677; *Banks*, at p. 802.)

### C.     Major Participation

These are the *Banks* factors:

> "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

Palacios emphasizes the lack of evidence of his role in the planning aspect of the conspiracy and attempted robbery. The absence of such evidence does not mean he was *unaware* of the plan. De La Cerda's testimony indicated he knew of the plan at least several hours before the fatal encounter took place. Several of the overt acts alleged in the charging information had already occurred, and the attempt itself was arguably under way, when the group headed to Lemoore to rob the victim at the casino. (See *People v. Watkins* (2012) 55 Cal.4th 999, 1021 ["The overt act element of attempt requires conduct

26.

that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action'"].)

Palacios could have abandoned the conspiracy when the group arrived at the casino by separating himself from Morales and De La Cerda. He had a working cell phone and could have called somebody for a ride home or elsewhere. Instead, he stayed with his coconspirators for another 90 minutes until they reached the victim's home. By the time of their arrival, Palacios knew he would be posing as De La Cerda's cousin and personally participating in the robbery. When questioned about the substance of their discussions prior to the shooting, De La Cerda testified, "Me and Mr. Palacios were going to … walk into the garage, go in first, and then Mr. Morales was going to come in after."

De La Cerda further testified, albeit vaguely, that the plan to rob the victim was discussed on the drive to the casino. Palacios invites us to speculate about his ability to hear everything Morales and De La Cerda were saying from his location in the back seat of the SUV. As with many of his arguments, he construes the record in the light most favorable to his own interests. We must construe the record in the light most favorable to the People and the jury's verdict. (*People v. Thomas* (2023) 14 Cal.5th 327, 377.)

There is no evidence Palacios supplied the guns used in the predicate felony, but he did use a gun during the offense. Witness J.B. testified, in reference to the male perpetrators, "They both had handguns. [¶] … [¶] I'm pretty sure pistols." J.B. consistently used the word "they" in her testimony. For example: "They start beating him up," "They demanded the dope," "They [were] pistol whipping him."

"[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.) J.B.'s testimony was sufficient to support the jury's finding that Palacios personally used a firearm during the incident. Her testimony about hearing the "bones in [the victim's] face breaking," combined with police testimony

27.

about the victim's facial wounds and the results of his autopsy, was sufficient to support the jury's finding of personal infliction of GBI.

In his opening brief, Palacios twice misstates the record by alleging De La Cerda testified Morales "was beating up [the victim] 'more' than [Palacios] was." In his reply brief, he repeatedly contends Morales was the primary aggressor. The assertion is unsupported by the record citations he provides (and in some instances there are no citations). The prosecutor did ask De La Cerda, "Who was beating who up?" Her testimony, which appears on page 565 of the Reporter's Transcript, was as follows: "Mr. Palacios and Mr. Morales more were beating up Lopez," i.e., the victim Albert Lopez. If Palacios is assuming the court reporter failed to insert commas that would support his purported understanding of the testimony, we again remind him the record is construed in the light most favorable to the judgment.

The next *Banks* factor is a defendant's awareness of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants." (*Banks*, *supra*, 61 Cal.4th at p. 803.) Palacios focuses on the lack of evidence about his relationship with Morales, which does weigh in his favor. The other two considerations strongly weigh against him.

Because felony-murder liability is already restricted to deaths occurring in the commission of inherently dangerous felonies, "[a]wareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient." (*Banks*, *supra*, 61 Cal.4th at p. 808.) The *Banks* opinion used the phrase "garden-variety armed robbery" while discussing robberies "where death might be possible but not probable." (*Id*. at p. 802.) The subsequent *Clark* opinion clarifies that "'a garden-variety armed robbery'" is a "robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun." (*Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74.) Palacios does not use the phrase garden-variety, but he does argue there was no evidence to suggest he was

28.

"'engaging in criminal activities known to carry a grave risk of death.'" (*Banks*, at p. 805.)

The People rely on *In re McDowell* (2020) 55 Cal.App.5th 999, which involved similar facts. In *McDowell*, two armed men attempted to rob a methamphetamine dealer inside his home. (*Id*. at p. 1005.) One of the perpetrators had a firearm, and the other was holding a knife "with the blade protruding between the index and middle fingers." (*Ibid*.) The dealer resisted and was shot to death. According to an eyewitness, "[t]he whole incident took '[m]aybe like a minute.'" (*Ibid*.)

The knife-wielding accomplice, Donald William McDowell, argued he was not a major participant in the crime. The appellate court disagreed. "Although there [was] no evidence McDowell supplied the murder weapon, McDowell was himself armed with, and brandished, a deadly or dangerous weapon. Moreover, McDowell's decision to arm himself with a palm knife should be viewed in combination with the particularly risky crime that he planned and led—a home invasion robbery of a methamphetamine dealer. This was not a garden-variety robbery. [Citation.] The potential for it to turn violent was obvious."[7] (*In re McDowell*, *supra*, 55 Cal.App.5th at p. 1011.)

Palacios contends there was no evidence his gun was "operable or loaded," which is a weak argument. "[A]n inoperable gun still creates a risk of harm because its passive display 'may stimulate resistance.' [Citation.] The same is true of an unloaded gun." (*People v. Bland* (1995) 10 Cal.4th 991, 1005.)

Pulling a gun on a drug dealer inside the dealer's home creates a heightened risk of deadly violence. "Drug dealers are known to keep guns to protect not only themselves, but also their drugs and drug proceeds." (*People v. Bland*, *supra*, 10 Cal.4th

---

[7]Palacios conspicuously ignores the *McDowell* case in his reply brief, but we nevertheless acknowledge two distinguishing circumstances among the otherwise closely analogous facts. The *McDowell* appellant was "instrumental in planning" the crime and had a brief opportunity to intervene on the victim's behalf after his accomplice fired a "warning shot." (*In re McDowell*, *supra*, 55 Cal.App.5th at pp. 1011, 1012.)

at p. 1005.) "'[B]ecause of the private nature of the surroundings and the recognized propensity of persons "engaged in selling narcotics [to] frequently carry firearms to protect themselves from would-be robbers," [citation] the likelihood that the occupants [of a residence] are armed or have ready accessibility to hidden weapons is conspicuously greater than in cases where … [someone] freely enters premises where legal business is transacted.'" (*People v. Glaser* (1995) 11 Cal.4th 354, 368.)  As such, the jury could reasonably infer Palacios's awareness of the extraordinary risks.  (See, e.g., *People v. Mora* (1995) 39 Cal.App.4th 607, 617 [defendant who entered drug dealer's house at night to rob him was a "'major participant'" and "had to be aware of the risk of resistance to such an armed invasion of the home and the extreme likelihood death could result"]; *People v. Bradford* (1995) 38 Cal.App.4th 1733, 1739 [noting "it is common knowledge that perpetrators of narcotics offenses keep weapons available to guard their contraband"].)

In addition, jurors may infer the gun used in a crime was loaded and operable based on the totality of the circumstances.  (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 12–13; *People v. Lochtefeld*, *supra*, 77 Cal.App.4th at p. 541 [appellant's conduct, "in both verbally threatening and in displaying and aiming the gun at others, fully supported the jury's determination the gun was sufficiently operable"].)  "Circumstantial evidence alone is sufficient …." (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1436.) "Common sense and common experience illustrate that little has changed since 1927, when a court astutely observed that criminals 'do not usually arm themselves with unloaded guns when they go out to commit robberies.'" (*Id*. at p. 1437, citing *People v. Hall* (1927) 87 Cal.App. 634, 635–636.)

Palacios brandished a firearm while demanding the victim, whom he knew to be in the business of selling illegal narcotics, turn over or reveal the location of his supply. Those facts, combined with the home-invasion aspect of the offense and the "common knowledge" that drug dealers "keep weapons available to guard their contraband"

(*People v. Bradford*, *supra*, 38 Cal.App.4th at p. 1739), permitted the jury to reasonably infer Palacios did not enter the garage with an unloaded or inoperable firearm. "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.'" (*People v. Westerfield*, *supra*, 6 Cal.5th at p. 713.)

Turning to the fourth *Banks* factor, the underlying rationale is "'[t]hose not present have no opportunity to dissuade the actual killer, nor to aid the victims, and thus no opportunity to prevent the loss of life. Nor, conversely, are they in a position to take steps that directly and immediately lead to death ….' [Citation.] 'As a corollary, there may be significantly greater culpability for accomplices who are present.'" (*People v. Montanez* (2023) 91 Cal.App.5th 245, 274.)

Palacios was present throughout the fatal incident. In what he perceives to be a strong argument for reversal, Palacios insists he had "absolutely no opportunity to have attempted to restrain Morales or intervene to prevent the [shooting]." The ability to prevent a confederate from engaging in the final deadly act is only one of the nondispositive considerations under this factor. While he may not have been able to stop Morales from pulling the trigger, the jury could infer he was "in a position to facilitate" the murder (*Banks*, *supra*, 61 Cal.4th at p. 803) and played a role in it through his joint participation in the pistol whipping. An accomplice's "physical presence as backup throughout the crimes" may be viewed as having "helped facilitate the completion" of those crimes and is supportive of a major participation finding. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 483.)

In *People v. Bascomb* (2020) 55 Cal.App.5th 1077, the appellant's use of a gun "to keep the other victims at bay" while his confederate "accosted the murder victim in his bedroom" was construed on appeal as evidence he "actively enabled the murder." (*Id.* at p. 1089.) Much like this case, *Bascomb* involved "a plan to break into the home of a known drug dealer while [he was] home and to use force, including firearms, to steal the

31.

dealer's product." (*Ibid*.) Despite his strenuous disagreement, there is evidence Palacios helped facilitate the murder.

Lastly, we consider what Palacios did after lethal force was used. (*Banks*, *supra*, 61 Cal.4th at p. 803.) The home security video shown to the jury, People's trial exhibit No. 19, was transmitted to this court at our request. (See Cal. Rules of Court, rules 8.224(d), 8.320(e).) The pertinent footage shows Morales exiting the garage first, followed by Palacios. Palacios is shown backing away from the garage while still facing towards it, with his right arm extended outward at approximately shoulder level. He lowers his arm almost as soon as he comes into the camera's view.

The prosecutor argued the video showed Palacios "clearly pointing a gun sideways as he comes out[,] as if covering the retreat." Palacios's trial counsel agreed there appeared to be an object in his hand, but argued, "I think it's a cell phone." The prosecutor's argument was a fair interpretation of the evidence, and it was within the jury's province to agree with it. We reach this conclusion not only based on the video, but on the eyewitness testimony that Palacios had a gun in his hand seconds before he exited the garage. The evidence of Palacios continuing to use his own firearm even after the victim was shot, and later attempting to destroy incriminating evidence by "smash[ing]" De La Cerda's cell phone on the drive back to Sanger, both weigh in favor of the jury's verdict under the fifth *Banks* factor.

Given the totality of the circumstances, the major participation finding is well supported by the record.

### D. Reckless Indifference to Human Life

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'" (*In re Scoggins*, *supra*, 9 Cal.5th at p. 676, quoting *Tison v. Arizona*, *supra*, 481 U.S. at p. 157.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the

defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) There are subjective and objective components. "Subjectively, the defendant must consciously disregard risks known to him or her. Objectively, recklessness is determined by 'what "a law-abiding person would observe in the actor's situation,"' that is, whether defendant's conduct '"involve[d] a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" (*People v. Oliver*, *supra*, 90 Cal.App.5th at p. 478, quoting *Clark*, at pp. 617–618.)

The *Clark* factors for determining the required mental state are, in essence, a "slightly modified version of the *Banks* factors." (*In re McDowell*, *supra*, 55 Cal.App.5th at p. 1009, citing *Clark*, *supra*, 63 Cal.4th at pp. 618–622.) Accordingly, the "degree of participation in the crime also can affect the reckless indifference inquiry; 'the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.'" (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1015.) In *Scoggins*, the California Supreme Court summarized the nonexhaustive list of reckless indifference factors:

> "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)

At the risk of belaboring the point, we reiterate that most of the *Banks* and *Clark* factors overlap. (*Clark*, *supra*, 63 Cal.4th at p. 615.) One such factor is presence. (*Id.* at p. 619; *Banks*, *supra*, 61 Cal.4th at pp. 802–803.) "Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry." (*People v. Garcia*

(2020) 46 Cal.App.5th 123, 148.) Another common factor is the accomplice's role as an armed perpetrator. "A defendant's *use* of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed robber killed the victim, can be significant to the analysis of reckless indifference to human life." (*Clark*, at p. 618.) Palacios's presence and personal use of a firearm during the attempted robbery strongly supports the jury's mens rea finding. (E.g., *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [regardless of whether appellant "actually expected to use his firearm," the awareness he and others had firearms and the act of "wielding" his firearm during the offense showed reckless indifference to human life.])

A nonoverlapping factor is the "duration of the interaction between victims and perpetrators." (*Clark*, *supra*, 63 Cal.4th at p. 620.) The basic reasoning is if "a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence.'" (*Ibid.*) Using the prosecutor's time estimate, Palacios argues "the entire incident had a very short duration and the occurrences in the garage lasted an astonishingly short *52 seconds*." He misses the point about the relationship between duration and the "'*opportunity* for violence.'" (*Clark*, at p. 620, italics added.) Nearly all of those 52 seconds involved acts of violence.

Palacios inexplicably contends he "was not 'aware of and willingly involved in the violent manner in which'" the felony was committed. (Partially quoting *Banks*, *supra*, 61 Cal.4th at p. 801.) We have already discussed the substantial evidence of his personal use of a firearm and personal infliction of GBI. Palacios further contends the facts are analogous to those in *Scoggins*, but they are not. The *Scoggins* appellant "did not use a gun, nor did he know that a gun would be used during the felony," and he was not "physically present" during the brief but deadly incident. (*In re Scoggins*, *supra*, 9 Cal.5th at pp. 677, 678.) Palacios also purports to rely on *In re Miller* (2017) 14 Cal.App.5th 960, which is another case where the accomplice "was not present at the

scene of the crime and there was no evidence he knew lethal force was appreciably more likely than that inherent in a 'garden-variety armed robbery.'" (*Id.* at pp. 966–967.)

Palacios would have us conclude 52 seconds is an insignificant amount of time for two people to be pistol whipping a victim. The time may have seemed to fly by for him since he was not the one getting pummeled in the face with blunt objects. Eyewitness J.B., who could "hear [the] bones in [the victim's] face breaking," testified those 52 seconds "seemed like forever." Regardless, the other problem with Palacio's argument is his failure to recognize the obvious risk of accidental discharge inherent in the act of pistol whipping. His own trial counsel argued the shooting was "likely" accidental given the evidence of fighting and "pistol whipping."

Another *Clark* factor is whether the defendant "engaged in efforts to minimize the risk of violence in the felony." (*Clark*, *supra*, 63 Cal.4th at p. 622.) Palacios made no apparent efforts to minimize the risk of violence. Substantial evidence shows he fully participated in the violence and inflicted great bodily injury while doing so.

The remaining factors are whether Palacios had an "opportunity to restrain the crime or aid the victim," and his knowledge or lack of knowledge regarding Morales's "propensity for violence or likelihood of using lethal force." (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677.) There is no evidence of knowledge as to Morales's violent tendencies. The evidence of an ability to restrain the crime is relatively weak if, as Palacios argues, the focus is on whether there was a realistic opportunity to physically prevent Morales from pulling the trigger.

The failure to render aid supports the reckless indifference finding, especially because Palacios continued to use a gun to facilitate his and Morales's flight after the victim was shot. (Cf. *People v. Mitchell* (2022) 81 Cal.App.5th 575, 593 ["Once the gunfire started, [appellant] worked to complete the robbery, not to care for the victim"].) His "only manifested concern" was for himself and Morales, thus reflecting his indifference to whether the victim lived or died. (*Id*. at p. 594.) This factor is somewhat

35.

mitigated by his knowledge J.B. was still in the garage and could presumably seek help for the victim.

To summarize, the "mere fact" that a robbery involves a gun, "on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 617.) There must be additional circumstances "that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id*. at p. 623.) Attempting to rob a drug dealer at gunpoint in his home (here the inside of an attached garage) is "not a garden-variety" armed robbery. (*In re McDowell*, *supra*, 55 Cal.App.5th at p. 1011.) It is a "particularly risky crime" (*ibid.*) involving not only a heightened risk of deadly violence, but "the extreme likelihood death could result" (*People v. Mora*, *supra*, 39 Cal.App.4th at p. 617).

The act of pistol whipping carries an obvious and inherent danger of accidental discharge, which further increased the risk of death in this case. Pursuant to the foregoing analysis, the jury had sufficient evidence to infer Palacios "'knowingly engag[ed] in criminal activities known to carry a grave risk of death'" and consciously disregarded the risks. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 676.) As to the objective component, the jury likewise had a sufficient basis to conclude Palacios's own actions elevated the possibility of death beyond "those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.)

The evidence satisfies most of the *Clark* factors. Palacios was present during the felony and personally used a gun while participating in the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–619.) He contributed to the violence occurring during the commission of the offense and did nothing to minimize it. (*Id*. at pp. 622–623.) He had an opportunity to render aid but did not, and his postshooting conduct reflected indifference toward the victim's survival or death. (See *id*. at pp. 619–620.) As with the element of major participation, the totality of the circumstances supports the finding of reckless indifference to human life.

### III.    Parole Revocation Fines

Defendants each contend the $10,000 parole revocation fines imposed under section 1202.45 are unauthorized.  The People concede both claims.  We accept the concession only as to Palacios.  Morales was subject to the fine but is entitled to have the amount reduced to $5,000.

Section 1202.45 applies "where a person is convicted of a crime and his or her sentence includes a period of parole" (*id*., subd. (a)), or the defendant is "subject to either postrelease community supervision … or mandatory supervision" (*id*., subd. (b)).  It does not apply in cases where the defendant is sentenced to LWOP and there are no determinate prison terms.  (*People v. Mclnnis* (2021) 63 Cal.App.5th 853, 866–867.)  Palacios was sentenced to LWOP for the murder conviction and to an indeterminate life term for conspiracy to commit robbery pursuant to the Three Strikes law.  Because neither of his sentences include a period of parole, section 1202.45 does not apply to him.  (E.g., *People v. Battle* (2011) 198 Cal.App.4th 50, 63; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.)

Morales's situation is different.  He had only one prior strike conviction coming into this case, and the trial court imposed determinate terms for counts 3 and 5.  The trial court imposed but suspended a $10,000 parole revocation fine pursuant to section 1202.45.

In *People v. Brasure* (2008) 42 Cal.4th 1037, the California Supreme Court upheld the imposition of a parole revocation fine where the appellant had been sentenced to death and to determinate prison terms.  (*Id*. at p. 1075.)  The *Brasure* court distinguished *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, upon which Morales relies, because *Oganesyan* did not involve any determinate terms of imprisonment.  (*Brasure*, at p. 1075.)  As here, the fine at issue in *Brasure* was imposed but suspended.  "Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked."  (*Ibid*.)

In *People v. Baker* (2021) 10 Cal.5th 1044, the appellant argued his parole revocation fine was unauthorized because, "as a person sentenced to death, he is ineligible for parole." (*Id*. at p. 1108.) The high court rejected the argument, stating the claim failed "under *People v. Brasure* because defendant was also sentenced to a determinate term." (*Baker*, at p. 1108, citing *People v. Brasure*, *supra*, 42 Cal.4th at p. 1075.)

Although Morales is subject to the provisions of section 1202.45, the statute expressly requires the fine to be "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (§ 1202.45, subd. (a).) The trial court imposed a $5,000 fine under the latter statute for victim restitution. Because the amounts of the fines need to match, we will modify Morales's judgment by reducing the parole revocation fine to $5,000.

## DISPOSITION

The $10,000 fine imposed pursuant to Penal Code section 1202.45 against Sabino Noel Palacios, Jr., is ordered stricken from the judgment. In all other respects, the judgment against Palacios is affirmed.

The judgment against Oscar Jose Carlos Morales, Jr., is ordered modified by reducing the fine imposed pursuant to Penal Code section 1202.45 from $10,000 to $5,000. As so modified, and in all other respects, the judgment against Morales is affirmed.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

SMITH, J.

38.